**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 324525)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

Stefan Bogdanovich (State Bar No. 324525)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: sbogdanovich@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINE LEVENS, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FOR GOODNESS SAKE LLC, | |
| Defendant. | |

1    Plaintiff Caroline Levens ("Plaintiff"), by and through her attorneys, brings this action on

2    behalf of herself and all others similarly situated.  Plaintiff makes the following allegations

3    pursuant to the investigation of her counsel and based upon information and belief, except as to

4    allegations specifically pertaining to herself and her counsel, which are based on personal

5    knowledge.

6                                    **NATURE OF THE ACTION**

7    1.     This is a class action suit brought against Defendant For Goodness Sake LLC.

8    ("Defendant") for violating the Video Privacy Protection Act ("VPPA") and California Civil Code

9    § 1799.3.

10   2.     Defendant owns and operates its website OMGYES.com (the "Website" or

11   "OMGYES"), a video streaming website that sells a package of "super-honest videos, animations

12   & how-to's" to explore "new techniques" when engaging in physical intimacy.[1]  Yet nothing about

13   this video purchase is intimate.

14   3.     Defendant has installed a "tracking pixel" on its Website.  This tracking pixel

15   surreptitiously sends consumers' video consumption and viewing activities to Meta Platforms, Inc.

16   ("Meta") without consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C §

17   2710, *et seq.*

18   4.     Congress has recognized that "films are the intellectual vitamins that fuel the growth

19   of individual thought."  S. Rep. No. 100-599, at *7 (Oct. 21, 1988) (citing Senate Judiciary

20   Subcommittee on Technology and Law, Hearing Tr. at 10 (Aug. 3, 1988)).  As the Committee on

21   the Judiciary explained when considering the VPPA, "[Privacy] is an issue that goes to the deepest

22   yearnings of all Americans that we are free and we cherish our freedom and we want our freedom.

23   We want to be left alone."  *Id.* at *6.  The VPPA was meant to give consumers the power to

24   "maintain control over personal information divulged and generated in exchange for receiving

25   services from video tape service providers."  *Id.* at *8.  "The Act reflects the central principle of the

26

27   _____

28   [1] OMGYES, https://www.OMGYES.com/join.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    1

1  Privacy Act of 1974: that information collected for one purpose may not be used for a different

2  purpose without the individual's consent." *Id.*

3      5.      Specifically, Defendant violated the VPPA by knowingly disclosing the personally

4  identifiable information ("PII") of Plaintiff and the class members to Meta without their consent.

5  To do so, behind the scenes of its videos, Defendant installed computer code on its Website called

6  the "Meta Pixel," which—unbeknownst to Plaintiff and the members of the Class—tracks and

7  records Plaintiff's and the Class Members' private video consumption and discloses it to Meta

8  without their consent.  Meta, in turn, uses Plaintiff's and the Class Members' video consumption

9  habits to build profiles on consumers and deliver targeted advertisements to them, among other

10  activities.[2]

11                              **THE PARTIES**

12      6.      Plaintiff Caroline Levens is a citizen of California who resides in Santa Clara,

13  California.  Plaintiff created an OMGYES account and accesses her account to watch videos.

14  Plaintiff has accessed her account and watched videos as recently as August 2024.  Plaintiff

15  accesses OMGYES videos on the same browser she uses to access her Facebook account, which

16  she created using her real name before she had an OMGYES account.  Plaintiff spent $39.00 to

17  access videos on the OMGYES website.

18      7.      Defendant For Goodness Sake LLC is a California limited liability company with its

19  principal place of business at 1277 Borregas Ave, Sunnyvale, CA 94089.  Defendant owns and

20  operates OMGYES.com, which is used throughout California and the United States.

21                      **JURISDICTION AND VENUE**

22      8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

23  § 1331 because it arises under a law of the United States (the VPPA).  This Court also has

24  supplemental jurisdiction over the California state law claims because they arise from the same

25  transactions and occurrences which gave rise to the action under federal law.  This Court further

26

27  [2] Notably, the Meta Pixel works in conjunction with its Conversion API tool and, as a
result, Defendant transmits one copy of its digital subscribers' viewing information directly from
its web server to Meta's web servers.  Additional copies of this information are communicated

28  through the use of cookies.

---

1    has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because

2    the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, there are more

3    than 100 members of the Class and California Subclass, and there is minimal diversity.

4        9.      This court has general personal jurisdiction over Defendant because Defendant's

5    principal place of business is in this District.

6        10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant

7    resides in this District.

8                              **FACTUAL ALLEGATIONS**

9    **A.    History And Overview Of The VPPA**

10       11.     The origins of the VPPA began with President Ronald Reagan's nomination of

11   Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie

12   rental store disclosed the nominee's rental history to the Washington City Paper which then

13   published that record.  With an eye toward the digital future, Congress responded by passing the

14   VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or
> Griffin Bell or Pat Leahy watch on television or read or think about
> when they are home.  In an area of interactive television cables, the
> growth of computer checking and check-out counters, of security
> systems and telephones, all lodged together in computers, it would
> be relatively easy at some point to give a profile of a person and
> tell what they buy in a store, what kind of food they like, what sort
> of television programs they watch, who are some of the people
> they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

22       12.     Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly

23   discloses, to any person, personally identifiable information concerning any consumer of such

24   provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information ("PII")

25   as "information which identifies a person as having requested or obtained specific video materials

26   or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider

27   is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental,

28

---

1   sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. §

2   2710(a)(4).

3       13.     Individuals who are "aggrieved" by a violation of the VPPA may bring an action for

4   "not less than liquidated damages" of $2,500 per violation, in addition to other remedies.  18

5   U.S.C. §§ 2710(c)(1)-(2).

6       **B.     Overview Of California Civil Code § 1799.3**

7       14.     Along a similar vein, the California Legislature enacted Cal. Civ. Code § 1799.3

8   which prohibits a "person providing video recording sales or rental services" from disclosing "any

9   personal information or the contents of any record, including sales or rental information, which is

10  prepared or maintained by that person, to any person, other than the individual who is the subject

11  of the record, without the written consent of that individual."

12      15.     Cal. Civ. Code § 1799.3 provides a wider breadth of protection compared to the

13  VPPA because it does not require that the information disclosed by video recording sales or rental

14  service providers be ***identifiable*** to any one particular person.  Instead, the statute forbids the

15  disclosure of generalized "personal information" without that person's consent, even if that

16  information does not serve to identify them.  The statute also forbids the disclosure of "the contents

17  of any record, including sales or rental information," such as the mere title of the video a subscriber

18  watches.  We know the statute independently forbids the "contents of any record," from being

19  disclosed without consent because the phrase is preceded by the word, "or" – not "and."  Under

20  California law, "the plain and ordinary meaning of the word 'or,' when used in a statute, is to

21  designate separate, disjunctive categories.  The word 'or' suggests alternatives.  In its ordinary

22  sense in a statute, the function of the word 'or' is to mark an alternative such as 'either this or

23  that.'"  *In re E.A.*, 24 Cal. App. 5th 648, 661 (2018) (citations omitted) (internal quotation marks

24  omitted).

25      16.     Under Cal. Civ. Code § 1799.3(c), Plaintiff and Class Members may seek injunctive

26  statutory damages of $500 per violation.

27  ///

28  ///

**C.    Overview Of The Meta Pixel**

17.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[3]  Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and are encouraged to share "the name they go by in everyday life."[5]  To that end, when creating an account, users provide their first and last name, along with their birthday, gender, and phone number or email address.[6]

18.    Meta owns Facebook.com and generates revenue by selling advertising space on its website, and other applications it owns, like Instagram.[7]

19.    Meta sells advertising space by highlighting its ability to target users.[8]  Meta can target users effectively because it surveils user activity both on and off its site.[9]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "demographics."[10]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

---

[3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO! (July 28, 2021), available https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html (last accessed June 21, 2024).

[4] Sam Schechner & Jeff Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure it Out*, Wall St. J. (Oct. 21, 2021) available https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed June 21, 2024).

[5] META, *Community Standards, Part IV Integrity and Authenticity,* available https://www.facebook.com/communitystandards/integrity_authenticity (last accessed June 21, 2024).

[6] META, *Sign Up*, available https://www.facebook.com/ (last accessed June 21, 2024).

[7] Mike Isaac, *Facebook Profit Surges 101 Percent on Strong Ad Sales*, N.Y. TIMES (July 28, 2021) available https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last accessed June 21, 2024).

[8] META, *Why Advertise on Facebook, Instagram and other Meta Technologies*, available https://www.facebook.com/business/help/205029060038706 (last accessed June 21, 2024).

[9] META, *About Meta Pixel*, available https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed June 21, 2024).

[10] META, *Audience Ad Targeting*, available https://www.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

[11] META, *Easier, More Effective Ways to Reach the Right People on Facebook*, available https://www.facebook.com/business/news/Core-Audiences (last accessed June 21, 2024).

---

20.     Businesses can also build "Custom Audiences."[12]  Custom audiences enable businesses to reach "people who already know [their] business," because Meta can track whether they're loyal customers or people who have used a particular business' app or visited their website.[13]  Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[14]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15]  One such Business Tool is the Meta Pixel.

21.     The Meta Pixel is a piece of code that businesses, like Defendant, can integrate into its Website.  Once activated, the Meta Pixel "allows [the site] to track visitor activity on [their] website."[16] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

22.     Businesses control what actions—or, as Meta calls it, "events"—the Meta Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer

---

[12] META, *Create a website custom audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).

[13] META, *Audience ad targeting*, available https://en-gb.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

[14] META, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed June 21, 2024).

[15] META, *Create a Customer List Custom Audience*, available https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *See Also* Meta, *Create a Website Custom Audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).

[16] META, *Meta Pixel*, available https://developers.facebook.com/docs/meta-pixel/ (last accessed June 21, 2024).

views.[17] Businesses can also configure the Meta Pixel to track other events. Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[18] An advertiser can also create their own tracking parameters by building a "custom event."[19]

23.     Likewise, businesses using the pixel on their website control how the Meta Pixel identifies consumers. The Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20] The HTTP Headers collect "IP addresses, information about the web browser, page location, document referrer and persons using the website."[21] Pixel-specific Data includes "the Pixel ID and Cookie."[22]

24.     The Meta Pixel, like website cookies generally, attaches to the browser that the user uses to access their Facebook account. That cookie then follows the user's web activity occurring within that same browser. For example, if the user accesses Facebook.com through their Safari browser, then moves to OMGYES.com after leaving Facebook, the Meta Pixel will continue to track that user's activity on that browser.

**D.     Defendant is a Video Tape Service Provider**

25.     Defendant owns and operates OMGYES, a video streaming service that features pre-recorded, on-demand series for streaming.[23] Yet unlike many other video streaming websites, OMGYES.com does not operate on a subscription model. Instead, it sells different packages of

---

[17] *See* META, *Meta Pixel, Accurate Event Tracking, Advanced*, available https://developers.facebook.com/docs/facebook-pixel/advanced/; See also Facebook, Best Practices for Facebook Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed June 21, 2024).

[18] META, *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed June 21, 2024).

[19] META, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed June 21, 2024).

[20] META, *Meta Pixel*, https://developers.facebook.com/docs/facebook-pixel/ (last accessed June 21, 2024).

[21] *Id.*

[22] *Id.*

[23] HTTPS://WWW.FGSAKE.ORG/

---

prerecorded videos that consumers can "[p]ay[for] once" and thus "access… forever, like buying a book."



**Figure 1**

26.      Consumers can either purchase access to either the limited set of 60+ videos, called the *Essentials* package, or the full library of 300+ videos, called the *Essentials Plus* package.



**Figure 2**

**E.**    **OMGYES and the Meta Pixel**

27.    Unbeknownst to Defendant's consumers, whenever they buy a video package from OMGYES, or thereafter watch the videos they purchased, OMGYES knowingly discloses users' video consumption histories to Meta.

28.    The OMGYES Website hosts the Meta Pixel, which transmits events to Meta.

29.    When a consumer clicks the "GET IT NOW" button on one of the two video packages in Figure 2, she is redirected to a create an account page, and the pixel discloses that button click, along with six different events to Meta. *See* Figures 3-A and 3-B, below.



**Figure 3-A**



**Figure 3-B**

30.     The pixel identifies the name of the bundle of videos the user selected. So, for example, if a consumer clicked on the "Get it now" button below the *Essentials Plus* video package listed in Figure 2, OMGYES discloses that information to Meta. *See* Figures 4-A and 4-B



**Figure 4-A**



**Figure 4-B**

31.     The same is true after a user creates an account and logs in to watch the videos they purchased and believe they owned. The Meta Pixel then sends the PageView event, which shows the URL of the page where the video lies to Meta. The title of the video is reflected in the webpage

URL.  For example, in Figures 5-6, the title of the lesson and video is "Framing," and the URL of the video page also contains that name (https://www.omgyes.com/en/collections/<u>framing</u>).  In the same PageView event, the Meta Pixel also sends to Meta along the c_user and fr cookies of the user. *See* Figure 7, next page.



**Figure 5**

**Figure 6**



**Figure 7**

32.    The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows anybody—not just Facebook—to identify the individual OMGYES subscriber with a Facebook account.  If one types www.facebook.com/[c_user] into a web browser, it will load the individual's Facebook page.

33.    The Meta Pixel transmits additional cookies to Meta.

34.    The fr cookie, active on Defendant's site, contains, at least, an encrypted Facebook ID and browser identifier.[24]  Facebook, at a minimum, uses the fr cookie to identify particular users.[25]

35.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

36.    Without a corresponding Facebook ID, the c_user cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

---

[24] DATA PROTECTION COMMISSIONER, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), available http://www.europe-v-facebook.org/ODPC_Review.pdf

[25] META, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/ (last accessed June 27, 2024).

37.     The Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e. OMGYES.com.[26]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[27]

38.     Meta, at a minimum, uses the c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

39.     Through the Meta Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what OMGYES products consumers are requesting and watching for entertainment.

40.     Defendant disclosed Plaintiff's video viewing behavior as she viewed videos on the Website, alongside her Facebook ID, as described in the examples above. The videos are of an extremely private and intimate nature and are linked to the consumer's Facebook profile.

41.     The OMGYES website also uses "Advanced Matching."  With Advanced Matching, the pixel implemented on the OMGYES "look[s] for recognizable form fields and other sources on your website that contain information such as first name, last name and email."[28]  That information is recorded, "along with the event, or action, that took place."[29]

---

[26] PC MAG, First Party Cookie, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

[27] PC MAG, First Party Cookie, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

[28] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[29] Id.

42.     OMGYES discloses this information so it can better match visitors to their Facebook profiles, thereby allowing OMGYES to better target its advertisements:

You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

**Figure 8**

43.     As part of Advanced Matching, Defendant has enabled "Automatic Advanced Matching for Partner Integrations."

```
Headers   Payload   Preview   Response   Initiator   Timing
    instance.optIn("2390243544547786", "FirstPartyCookies", true);
    fbq.loadPlugin("inferredevents");
    instance.optIn("2390243544547786", "InferredEvents", true);
    fbq.loadPlugin("automaticmatchingforpartnerintegrations");
    instance.optIn("2390243544547786", "AutomaticMatchingForPartnerIntegrations", true)
```

**Figure 9**

44.     "Partners Integrations" means OMGYES employs another third-party to "install Meta Business Tools."[30]

45.     Defendant has also customized its Pixel to collect a subscriber's email address through Manual Advanced Matching which discloses the email address whenever the user creates an account, as depicted in Figures 4-A and 4-B, above.

46.     When subscribers enter their email into that form field, the Pixel implemented on OMGYES's Website transmits this information to Meta.  When subscribers later navigate

---

[30] FACEBOOK, ABOUT FACEBOOK PARTNER INTEGRATIONS, https://www.facebook.com/business/help/1179210765468894?id=1205376682832142

OMGYES, the Meta Tracking Pixel will transmit this identifier alongside the event data previously shown. The email address enables the social media site to match that event data with a Facebook profile.

47.     OMGYES knows Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity, thereby helping OMGYES "[i]ncrease the number of attributed conversions," "[i]ncrease [its] Custom Audience size," and "[d]ecrease the cost per conversion."[31]

48.     By compelling a visitor's browser to disclose the Advanced Matching parameters alongside event data for videos, OMGYES knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

49.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, OMGYES knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

## CLASS ALLEGATIONS

50.     **Nationwide Video Privacy Class.** Plaintiff Levens seeks to represent a class of similarly situated individuals defined as:

> All persons in the United States who have a Facebook account, have a OMGYES account, and watched OMGYES videos on the OMGYES.com Website using the same browser the person uses to access their Facebook account.

51.     **California Video Privacy Subclass.** Plaintiff Levens also seeks to represent a California Subclass defined as:

> All persons in California who have a OMGYES account and watched OMGYES videos on the OMGYES.com Website and had their video-viewing information disclosed to a third party (the "California Subclass").

52.     The Nationwide Video Privacy Class and California Video Privacy Subclass shall be collectively referred to as the "Classes."

---

[31] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

53.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

54.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the Classes. However, given the popularity of Defendant's Website, the number of persons in the Classes is believed to be so numerous that joinder of all members is impracticable.

55.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include but are not limited to:

(i)     Whether Defendant collected Plaintiff's and the Class Members' PII;

(ii)    Whether Defendant disclosed Plaintiff's and the Classes' PII to Meta in violation of the VPPA and Cal. Civ. Code § 1799.3;

(iii)   Whether Defendant's disclosures were committed knowingly and intentionally; and

(iv)    Whether Defendant disclosed Plaintiff's and the Classes' PII without their consent;

(v)     Whether Defendant failed to clearly and conspicuously disclose it was conveying a limited license to videos that could be unilaterally revoked; and

(vi)    Whether Defendant received acknowledgments from consumers indicating they knew they were only obtaining revocable licenses to videos.

56.     **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, watched pre-recorded videos on the Website, and had her PII and video-viewing information disclosed to third parties.

57.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including VPPA and Cal. Civ. Code § 1799.3 actions.  Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor her counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

58.     **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**Violation Of The VPPA**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Video Privacy Class)**

59.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

60.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

61.     Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  In particular, Defendant provides a library of hundreds of audiovisual material to consumers in exchange for money.

62.     Plaintiff and Class members are "consumers" as defined by the VPPA because they are "purchasers" of "goods or services from a video tape service provider." *See* 18 U.S.C. § 2710(a)(1). In particular, they paid money to access the library of videos on the OMGYES.com website. Plaintiff Class members are also "subscribers" of "goods or services from a video tape service provider."  *See* 18 U.S.C. § 2710(a)(1). In particular, they needed to create an OMGYES account to access Defendant's library of pre-recorded video content, they gave Defendant their email addresses, and provided Defendant with their personal information.

63.     Defendant disclosed to a third party, Meta, Plaintiff's and the Class Members' personally identifiable information.  Defendant installed the Meta Pixel on its Website to compel Plaintiff's browsers to transfer their personally identifying information in the form of their Facebook ID, along with event data like the title of the video they viewed, to Meta.

64.     Plaintiff and the members of the Class viewed and accessed the videos using their OMGYES accounts.

65.     Defendant knowingly disclosed Plaintiff's PII because it installed the Meta Pixel on its Website and controlled its functionality.

66.     Plaintiff and the members of the Class did not provide Defendant with adequate consent—either written or otherwise, "in a form distinct and separate from any form setting forth other legal or financial obligations"[32]—to disclose their PII and event data to third parties.

67.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. Specifically, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

68.     On behalf of herself and the members of the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of the Plaintiff and the Class by requiring Defendant comply with the VPPA's requirement for protecting a consumer's PII; (3) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

**COUNT II**
**Violation of California Civil Code § 1799.3**
**(On Behalf of Plaintiff and the Nationwide and California Video Privacy Class and Subclass)**

69.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

70.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide and California Video Privacy Class and Subclass against Defendant.

71.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sale or rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

72.     Defendant is a "person providing video recording sales or rental services" because it sells access to its online platform via its Website where Defendant provides access to pre-recorded video content.

_____
[32] 18 U.S.C. § 2710(b)(2)(B)(i).

73.     Defendant disclosed to a third party, Meta, Plaintiff's and Subclass members' personal information.  Defendant utilized the Meta Pixel to compel Plaintiff's and Subclass members' browsers to transfer Plaintiff's personal information, like their Facebook ID, and event data, such as the title of the videos they viewed, to Meta.

74.     Plaintiff and the Subclass members viewed and accessed the videos on OMGYES by using their accounts on OMGYES.

75.     Defendant knowingly disclosed Plaintiff's and California Subclass members' PII because it used the data and installed the Meta Pixel in the background of its Website for targeted advertising and remarketing.

76.     Plaintiff and California Subclass members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

77.     On behalf of herself and the California Subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Subclass by requiring that Defendant complies with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c), and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendant, on behalf of herself and all others similarly situated, as follows:

(a)     For an order certifying the Classes pursuant Fed. R. Civ. P. 23, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     For an award of statutory damages to the extent available;

(e)    For an award of restitution and disgorgement of profits in an amount to be determined at trial;

(f)    For punitive damages, as warranted, in an amount to be determined at trial;

(g)    For prejudgment interest on all amounts awarded; and

(h)    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury of any and all issues so triable.

Dated: March 17, 2025                             Respectfully submitted,

                                                  **BURSOR & FISHER, P.A.**

                                                  By: */s/ Philip L. Fraietta*
                                                          Philip L. Fraietta

                                                  Philip L. Fraietta (State Bar No. 324525)
                                                  1330 Avenue of the Americas, 32nd Floor
                                                  New York, NY 10019
                                                  Telephone: (646) 837-7150
                                                  Facsimile: (212) 989-9163
                                                  Email: pfraietta@bursor.com

                                                  Stefan Bogdanovich (State Bar No. 324525)
                                                  1990 North California Blvd., 9th Floor
                                                  Walnut Creek, CA 94596
                                                  Telephone:  (925) 300-4455
                                                  Facsimile:  (925) 407-2700
                                                  Email: sbogdanovich@bursor.com

                                                  *Attorneys for Plaintiff*